COURT OF APPEALS
DECISION
DATED AND FILED

March 9, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP785-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. **2016CF4729**

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

KEYON D. GRANT,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: T. CHRISTOPHER DEE, Judge. *Affirmed*.

Before Brash, P.J., Dugan and Donald, JJ.

¶1 BRASH, P.J. Keyon D. Grant appeals his judgment of conviction for first-degree recklessly endangering safety and possession of a short-barreled shotgun, as well as an order of the trial court denying his motion for postconviction relief. Grant argues that he was denied his Sixth Amendment right to choose the

objective of his defense, pursuant to *McCoy v. Louisiana*, 584 U.S. ___, 138 S. Ct. 1500 (2018), and is seeking a new trial.

¶2    The trial court held a postconviction hearing on this issue and determined that the *McCoy* rule was not applicable; thus, there was no Sixth Amendment violation.  We affirm.

## BACKGROUND

¶3    The charges against Grant stem from a shooting at McGovern Park, located in the city of Milwaukee, in October 2016.  Officers responding to the shooting discovered the victim, D.P., suffering from a gunshot wound to the head.  D.P. identified Grant as the person who had driven him to McGovern Park and then shot him with a sawed-off shotgun.

¶4    Grant was arrested and charged with attempted first-degree intentional homicide.  The State later added the charge of possession of a short-barreled shotgun or rifle.

¶5    A jury trial was held in January 2018.  D.P. testified that on the night of the shooting, Grant picked him up at a gas station at approximately 8:30 p.m.  D.P. stated that Grant pulled up in a tan, four-door vehicle with two other people in the car—a male and a female.  D.P. asked Grant to give him a ride home.

¶6    Instead, D.P. testified that Grant drove him to McGovern Park.  Grant drove to a parking lot between a building and a pond; it was dark, and there was no one else in the area.  D.P. stated that Grant got out of the car and was talking on his cell phone.  D.P. also got out of the car, and saw that Grant was carrying a sawed-off shotgun.

¶7 D.P. testified that as he was turning to walk away, Grant shot him from a couple feet away. D.P. said he had a short struggle with Grant, and then ran into the bushes where he fell unconscious. D.P. testified that the shotgun blast tore off part of his ear, fractured his skull, and left a bullet that remains embedded close to his brain.

¶8 Talva McCall, the male passenger in the car, also testified. McCall stated that he was also getting a ride home from Grant that night, but that Grant had "unexpectedly" driven to McGovern Park. McCall said that both Grant and D.P. got out of the car, but he and the female were talking inside the car so he was not paying attention to them until he heard a shot. He saw a "big cloud of dust in the air" and D.P. on the ground, and he heard D.P. say "why you do that to me[?]" McCall testified that he and the female then fled the scene.

¶9 Although McCall did not see Grant shoot D.P., he knew Grant to have a sawed-off shotgun. McCall testified that a few days after the shooting, a "girl" gave a sawed-off shotgun to McCall, which McCall identified as belonging to Grant. McCall stated he hid the shotgun at his parents' house; he later told police where to find it when he was arrested on a different matter.

¶10 Other evidence introduced at trial included surveillance video from the gas station where D.P. was picked up. A tan Mazda, missing its front passenger-side hubcap, is seen at the gas pump at the time D.P. said Grant picked him up there. That vehicle was found to be registered to Grant. Additionally, the video shows the driver of the vehicle wearing clothing that matched the description of Grant given by D.P. on the night of the shooting. Other physical features of the driver as seen in the video also match the description of Grant, such as hair and skin tone. Moreover, D.P. is seen on the surveillance video getting into the tan vehicle.

¶11     Surveillance video from McGovern Park was also admitted. A tan Mazda missing the front passenger-side hubcap is seen pulling into the parking lot at 9:14 p.m. That vehicle is seen leaving the park a few minutes later. A spent shotgun shell casing was found in that area, which ballistics tests showed was fired from the gun the police recovered at McCall's parents' house.

¶12     Grant chose not to testify, and the defense called no witnesses. During closing arguments, counsel for Grant, Attorney Glenn Givens, stated that D.P. was "the victim of an accident." Attorney Givens noted that at the distance from which D.P. claimed Grant shot him—approximately five feet—"you don't miss," and therefore there was no intent to kill because if there had been, D.P. "would not be here." Attorney Givens had also suggested during his opening statement that the shooting was unintentional.

¶13     After the jury left to start deliberating, Grant informed the trial court that he was "very unhappy" with how Attorney Givens had proceeded. Grant stated that he had told Attorney Givens that he "was not there" when D.P. was shot and that he had never seen the gun. Grant therefore said that he was "not agreeing" with Attorney Givens' closing argument that "made it seem like [Grant] accidentally shot [D.P.]." Grant further alleged that the witnesses, in particular McCall, had lied.

¶14     The jury returned a verdict convicting Grant of the lesser-included charge of first-degree recklessly endangering safety as well as possession of a short-barreled shotgun. Grant was sentenced to a total of seventeen years of imprisonment, bifurcated as nine years and six months of initial confinement, and seven years and six months of extended supervision.

¶15     After the *McCoy* decision was issued by the United States Supreme Court, Grant filed a motion for postconviction relief seeking a new trial. Grant

argued that he was denied his right to choose the objective of his defense, as mandated in *McCoy*. *See id.*, 138 S. Ct. at 1505. Grant filed an affidavit with his motion, in which he averred that he had told Attorney Givens that he was not at the park when D.P. was shot, and had "expected [his] defense at trial to be that [he] was not present when the shooting occurred, and that the witnesses who said that [he] was were not truthful."

¶16 The trial court held an evidentiary hearing on the issue in November 2019. Attorney Givens testified at the hearing regarding how the defense strategy for the case was developed. He stated that at his initial meeting with Grant, Grant indicated that there was "nothing to worry about" because the male in the car was his "brother" and he would not testify against Grant[1]; the female in the car was a "dope addict" and she would not be found; and that Grant would be "out by May." In short, Grant did not believe that the State would be able to prove its case.

¶17 However, after McCall was arrested and said "some very negative things" about Grant, Attorney Givens stated that he and Grant started having "some serious conversations" about strategy for the case, and began going through discovery. Attorney Givens' description of those conversations was that Grant made "different denials." For example, Attorney Givens testified that he discussed the surveillance video with Grant, who at first denied that the car in the video was his. However, after Attorney Givens pointed out that Grant had been arrested in Indiana in that car—Grant had been released from custody after the State could not comply with his speedy trial demand—Grant admitted that it was his car. Based on

---

[1] Although Grant referred to McCall as his brother, the two are not actually related.

their discussions, Attorney Givens interpreted Grant comments as "clearly admit[ing] being there[.]"

¶18 Attorney Givens further noted that Grant's "take on the discovery" was that no one had seen him "pull the trigger," so they would not be able to testify that he was the shooter. Thus, at that point in strategy development, Attorney Givens understood that the trial strategy was not to argue that Grant was not at the scene of the shooting, but rather that he was not the shooter. Indeed, Attorney Givens stated that it appeared that Grant still did not believe that the witnesses would "take the stand and testify against him."

¶19 As the trial date got closer, Attorney Givens stated that he repeatedly told Grant that he did not believe that Grant had intentionally tried to kill D.P. However, he said that Grant did not "necessarily participate that much in the discussions" and that he did not think Grant was "doing much listening"; instead, Grant said that he wanted to "hear what [the witnesses are] going to say." Thus, Attorney Givens said that he proceeded to "pretty much develop[] [his] own strategy," as Grant was not "giving [Attorney Givens] a lot of input[.]" That strategy was to "try[] to get this thing down to something less than attempted homicide." Attorney Givens testified that in his communications with Grant—which never broke down throughout the proceedings, according to Attorney Givens—Grant never stated that he did not want to proceed with that strategy.

¶20 In fact, Attorney Givens stated that Grant never indicated that he had "changed his mind" regarding the theory of defense until the State had rested, and they were discussing whether Grant would testify. Grant then told Attorney Givens that he could not take the stand because "[he] wasn't there." However, Grant had "sort of a smirk" on his face as he said this, such that Attorney Givens was not sure

6

if he was serious, particularly given the timing of Grant's statement at the end of the trial—essentially too late to change strategy. Thus, Attorney Givens proceeded with his closing argument that focused on the lack of intent.

¶21    Grant did not testify at the postconviction hearing.

¶22    The trial court denied Grant's motion. It found Attorney Givens' testimony to be credible, noting his extensive experience. The court acknowledged a defendant's "autonomy in choosing the strategy of completely denying involvement in the charged crime or crimes," pursuant to *McCoy*. However, the court found that the *McCoy* case was not on point here due to the difference in the "existence and timeliness of the defendants' assertions that they wished to pursue" such a defense.

¶23    The trial court explained that in *McCoy*, the defendant "had made several assertions, prior to trial and prior to closing arguments, that he was not involved in the crimes, that he was not there, and did not want to pursue trial counsel's 'state of mind' strategy." *See id.*, 138 S. Ct. at 1505. The trial court noted that was not the case here, instead finding this case to be more in line with *Florida v. Nixon*, 543 U.S. 175 (2004), where the defendant "was found to be largely 'nonresponsive' to discussions about trial strategy and did not complain until after verdicts were reached." Furthermore, the court observed that while Grant had "[c]learly … objected on the record to the tactics of trial counsel after the case had been argued and sent to the jury for deliberations" there was "[n]o other on-the-record protestation by Grant[.]" As a result, the court found that there was no Sixth Amendment violation in this case. *See id.* at 192.

¶24    Based on that analysis, the trial court declined to set aside the verdicts and order a new trial for Grant. This appeal follows.

**DISCUSSION**

¶25 Grant argues that he was denied his Sixth Amendment right to choose the objective of his defense. This is a question of constitutional fact, the review of which presents a mixed question of law and fact. *State v. Martwick*, 2000 WI 5, ¶16, 231 Wis. 2d 801, 604 N.W.2d 552. We will not reverse the trial court's findings of fact unless they are clearly erroneous; however, we review *de novo* the application of constitutional principles to those facts. *See State v. Eason*, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625.

¶26 Grant asserts that the United States Supreme Court's holding in *McCoy* is applicable in this case.[2] The issue in *McCoy* was whether trial counsel can—over the objection of the defendant—concede that defendant's guilt. *See id.*, 138 S. Ct. at 1505. The Court held that doing so is a violation of the Sixth Amendment. *Id.*

¶27 The premise for the *McCoy* rule is that a defendant's rights under the Sixth Amendment to make "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate." *See Nixon*, 543 U.S. at 187. These decisions include "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *McCoy*, 138 S. Ct. at 1508. The *McCoy* Court determined that

---

[2] Although Grant's trial was held prior to *McCoy v. Louisiana*, 584 U.S. ___, 138 S. Ct. 1500 (2018), the rule adopted therein can be applied to this case retroactively. The *McCoy* rule is one of criminal procedure, which, unlike a substantive rule, "'do[es] not produce a class of persons convicted of conduct the law does not make criminal'"; instead, a procedural rule "'merely raise[s] the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise.'" *Welch v. United States*, 136 S. Ct. 1257, 1265 (2016) (citation omitted). In Wisconsin, "new rules of criminal procedure are to be applied retroactively to *all cases pending on direct review* or non-finalized cases still in the direct appeal pipeline." *State v. Lagundoye*, 2004 WI 4, ¶12, 268 Wis. 2d 77, 674 N.W.2d 526 (emphasis added); *see also State v. Chambers*, 2021 WI 13, ¶21 n.7, __ Wis. 2d ___, ___ N.W.2d ___.

"[a]utonomy to decide that the objective of the defense is to assert innocence" also belongs in that category, as opposed to being in the realm of "[t]rial management," which is "the lawyer's province[.]" *Id.* The Court explained that such decisions "are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*." *Id.*

¶28 The *McCoy* Court reviewed trial counsel's actions in a capital case: the defendant was accused of committing three murders, for which the government was seeking the death penalty. *Id.* at 1505. The defendant "vociferously insisted" he had not committed the crimes, even though there was "overwhelming" evidence to the contrary. *Id.* at 1505-06. Despite the defendant maintaining his innocence throughout the trial, during the guilt phase of the trial, trial counsel told the jury that the defendant had "committed three murders…. [H]e's guilty." *Id.* at 1505 (alterations in *McCoy*).

¶29 The Court recognized that the defendant in *McCoy* had "opposed [trial counsel]'s assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." *Id.* at 1509. Thus, trial counsel knew of the defendant's "complet[e] oppos[ition]" to a concession, because he continued to "press[] [trial counsel] to pursue acquittal" throughout the proceedings during the guilt phase of the case. *Id.* at 1506. In fact, the defendant "testified in his own defense, maintaining his innocence and pressing an alibi difficult to fathom." *Id.* at 1507. Nevertheless, trial counsel conceded the defendant's guilt in both his opening statement and closing argument, characterizing the State's evidence as "unambiguous" that the defendant had committed the murders. *Id.* The Court held that this was a violation of the defendant's Sixth Amendment rights. *Id.* at 1505.

¶30    Still, the Court has also recognized that there are some situations in which such participation by the defendant is not forthcoming, which the trial court here recognized in citing *Nixon*. *Nixon* was also a capital case where trial counsel conceded the defendant's guilt during the guilt phase of the trial. *Id.*, 543 U.S. at 178. The fact that distinguishes it from *McCoy*, however, was that when trial counsel in *Nixon* tried to discuss this concession strategy with the defendant prior to trial, he was "generally unresponsive" and "never verbally approved or protested" the proposed strategy. *Nixon*, 543 U.S. at 181; *see also McCoy*, 138 S. Ct. at 1509. In fact, the defendant in *Nixon* "complained about the admission of his guilt only after trial." *McCoy*, 138 S. Ct. at 1509. Under those circumstances, the *Nixon* court held that trial counsel should not be "impeded by any blanket rule demanding the defendant's explicit consent." *Nixon*, 543 U.S. at 192.

¶31    In discussing *Nixon*, the *McCoy* court explained that its rule was "not to the contrary" of that holding:

> If a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy [he or] she believes to be in the defendant's best interest. Presented with express statements of the client's will to maintain innocence, however, counsel may not steer the ship the other way.

*McCoy*, 138 S. Ct. at 1509. Thus, the *McCoy* rule recognizing the right "to insist that counsel refrain from admitting guilt" is specific to circumstances in which *the defendant objects* to trial counsel making a concession.[3] *Id.* at 1505.

---

[3] We note that the holding in *Nixon* appears to be specific to capital cases. *See Florida v. Nixon*, 543 U.S. 175, 192 (2004). We further note that while the holding in *McCoy* was also made specifically in the context of a capital murder case, *see id.*, 138 S. Ct. at 1505, our supreme court in *Chambers* assumed without deciding that the holding in *McCoy* "applies equally in non-capital murder cases." *Chambers*, 2021 WI 13, ¶18 n.5. We do the same here.

¶32    We agree with the trial court that the facts of this case are not in alignment with *McCoy*. Here, the factual findings of the trial court demonstrate that Grant never made any protest regarding trial strategy throughout most of the proceedings. *See id.*; *see also State v. Chambers*, 2021 WI 13, ¶20, __ Wis. 2d ___, ___ N.W.2d ___ (where our supreme court recently held that a defendant must demonstrate both that he "expressly assert[ed]" that his defense objective was to maintain his innocence, and that trial counsel "overrode" that objective by conceding guilt, in order for a *McCoy* claim to succeed (quoting *McCoy*, 138 S. Ct. at 1509; some bracketing and quotation marks omitted)). It was not until the end of the trial, after he had heard all of the State's evidence against him, that Grant asserted his claim that Attorney Givens had gone against his wishes in seeking a lesser offense. These findings are supported by the record, and therefore are not clearly erroneous. *See Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶11, 290 Wis. 2d 264, 714 N.W.2d 530.

¶33    Furthermore, the trial court's findings establish that Grant failed to fully participate in the development of his theory of defense, which is *not* the same as objecting to it. *See McCoy*, 138 S. Ct. at 1509. Therefore, we conclude that the *McCoy* rule does not apply here. *See id.* Accordingly, we affirm Grant's judgment of conviction as well as the trial court's order denying his motion for a new trial.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.